**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF GEORGIA**
**SAVANNAH DIVISION**

THE MAYOR AND ALDERMEN OF THE
CITY OF SAVANNAH, GEORGIA,

                Plaintiff,

    v.

3M COMPANY; ALADDIN
MANUFACTURING CORPORATION;
ALLNEX USA, INC.; ARCHROMA U.S., INC;
AUGUSTA LIQUIDATIONS LLC;
CLARIANT CORPORATION; CLEARWATER
PAPER CORPORATION; CORTEVA, INC.;
COVESTRO LLC; COVESTRO COATING
RESINS, INC.; CYTEC INDUSTRIES INC.;
DAIKIN AMERICA, INC.; DUPONT DE
NEMOURS, INC.; E.I. DU PONT DE
NEMOURS AND COMPANY; EIDP, INC.;
ENVALIOR ENGINEERING MATERIALS,
INC.; FIRST QUALITY TISSUE SE, LLC.;
GRANITEVILLE SPECIALTY FABRICS,
LLC; GRAPHIC PACKAGING HOLDING
COMPANY; GRAPHIC PACKAGING
INTERNATIONAL, LLC; HALOCARBON
LIFE SCIENCES, LLC; HALOCARBON, LLC;
HPC HOLDINGS, INC.; ICT INDUSTRIES,
INC.; INDUSTRIAL METAL FINISHING,
INC.; INNOVATIVE CHEMICAL
TECHNOLOGIES, INC.; INTERNATIONAL
PAPER COMPANY; INV PERFORMANCE
SURFACES, LLC; JPS COMPOSITE
MATERIALS CORP.; KEMIRA WATER
SOLUTIONS INC.; KIMBERLY-CLARK
CORPORATION; MILLIKEN & COMPANY;
MOHAWK CARPET, LLC; MOHAWK
INDUSTRIES, INC.; MOUNT VERNON
MILLS, TNC.; OWENS CORNING; OWENS
CORNING COMPOSITE MATERIALS, LLC;
OWENS CORNING ROOFING AND
ASPHALT, LLC; OWENS CORNING SALES,

Case No. _____

JURY TRIAL DEMANDED

<u>**NOTICE OF REMOVAL**</u>

1

LLC; PACTIV LLC; PRAYON INC.;
QUALAWASH HOLDINGS, LLC; SAGE
AUTOMOTIVE INTERIORS, INC.; SHAW
INDUSTRIES GROUP, INC.; SHAW
INDUSTRIES, INC.; SOLVAY SPECIALTY
POLYMERS USA, LLC; STERLING
SPECIALTY CHEMICALS US LLC; THE
CHEMOURS CQMPANY; THE CHEMOURS
COMPANY FC, LLC; TRANTECH
RADIATOR PRODUCTS, INC.; and
FICTITIOUS DEFENDANTS A—J, those
persons, corporations, partnerships or entities
who acted either as principal or agent, for or in
concert with the other named Defendants and/or
whose acts caused or contributed to the damages
sustained by the Plaintiff, whose identities are
unknown to the Plaintiff, but which will be
substituted by amendment when ascertained,

                    Defendants.

Defendant 3M Company ("3M"), by undersigned counsel, hereby gives notice of the removal of this action, pursuant to 28 U.S.C. §§ 1442(a)(1) and 1446, from the Superior Court of Chatham County, Georgia, to the United States District Court for the Southern District of Georgia, Savannah Division. 3M is entitled to remove this action based on federal officer jurisdiction. As grounds for removal, 3M states as follows.

## PRELIMINARY STATEMENT

1.     The Mayor and Aldermen of the City of Savannah, Georgia ("Plaintiff") seeks to hold 3M and certain other Defendants liable based on their alleged conduct in designing, manufacturing, or selling per- and polyfluoroalkyl substances ("PFAS") or PFAS-containing products, purportedly resulting in alleged contamination of Plaintiff's drinking water supply that is drawn from the Abercorn Creek. The Complaint alleges that the Abercorn Creek has been

contaminated by PFAS discharges into and around the Savannah River emanating from upriver manufacturing facilities and wastewater treatment plants.

2. The alleged PFAS contamination of Plaintiff's water supply plausibly resulted at least in part from the use, storage, and/or disposal of PFAS-containing aqueous film-forming foams ("AFFF") that 3M and others developed and sold to the U.S. military in accordance with rigorous military specifications ("MilSpec") issued by the Department of Defense ("DoD"). AFFF is a firefighting foam that is highly effective for extinguishing fuel-based fires. Here, the alleged PFAS contamination of Plaintiff's water supply on the Abercorn Creek plausibly resulted at least in part from nearby use of MilSpec AFFF, including at military facilities such as Fort Gordon in Augusta, Georgia, and the Savannah International Airport, which is the location of current and former military facilities including the Savannah Air National Guard Base and the former Travis Field. Given the allegations in Plaintiff's Complaint here, the purported PFAS contamination of Plaintiff's water supply just as plausibly resulted (at least in part) from MilSpec AFFF use at Fort Gordon as from the non-AFFF PFAS sources identified in the Complaint—in fact, Fort Gordon is located about the same distance upriver from the Abercorn Creek as some of the wastewater treatment plants identified as sources of PFAS in the Complaint. The allegations in Plaintiff's own Complaint also indicate that, because of the shifting direction of the tides, the Abercorn Creek can be impacted by nearby downriver AFFF sites such as Savannah International Airport.

3. Because the alleged PFAS contamination of Plaintiff's drinking water supply plausibly resulted from the use, storage, and/or disposal of MilSpec AFFF, 3M intends to assert in this action the federal government contractor defense recognized in *Boyle v. United Technologies Corp.*, 487 U.S. 500 (1988), which bars Plaintiff from establishing, among other things, liability for the design and manufacture of MilSpec AFFF and for the provision of warnings for the product.

4.      Under the federal officer removal statute, 28 U.S.C. § 1442(a)(1), 3M is entitled to remove this action to have its federal defense adjudicated in a federal forum. Such removal "fulfills the federal officer removal statute's purpose of protecting persons who, through contractual relationships with the Government, perform jobs that the Government otherwise would have performed." *Isaacson v. Dow Chem. Co.*, 517 F.3d 129, 133 (2d Cir. 2008). Courts have held that AFFF manufacturers properly removed cases to federal court on the ground that the plaintiffs' claims plausibly arose at least in part from MilSpec AFFF. *See, e.g.*, *Nessel v. Chemguard, Inc.*, No. 1:20-cv-1080, 2021 WL 744683, at *3-4 (W.D. Mich. Jan. 6, 2021); *In re AFFF Prods. Liab. Litig.*, No. 2:18-mn-2873, 2019 WL 2807266, at *2-3 (D.S.C. May 24, 2019) ("*In re AFFF*").

5.      Although Plaintiff's Complaint purports to disclaim any damages arising from contamination or injury related to AFFF, Plaintiff's requests for relief encompass damages plausibly attributable to PFAS-containing MilSpec AFFF. PFAS from MilSpec AFFF use plausibly has commingled with alleged PFAS from non-AFFF sources in the drinking water for which Plaintiff seeks to recover. Moreover, PFAS from MilSpec AFFF is identical to PFAS from other sources, and Plaintiff has not explained how to segregate out the PFAS covered by its disclaimer. "3M's Military AFFF production is inextricably related to [Plaintiff's] general allegations of PFAS contamination, notwithstanding [Plaintiff's] attempts to draw a line between 3M's federal and non-federal work." *Maryland v. 3M Co.*, -- F.4th -- , 2025 WL 727831, at *8 (4th Cir. Mar. 7, 2025). 3M thus is entitled to a federal forum to litigate its federal defense.

## **BACKGROUND**

6.      Plaintiff filed this action on February 5, 2025, in the Superior Court of Chatham County, Georgia, bearing Case No. SPCV25-00167-MI. *See* Complaint (attached as Exhibit A).

7.      The Complaint alleges that Plaintiff provides drinking water to customers in Savannah, Chatham County, and Effingham County. *See* Complaint ¶ 27. The Complaint further alleges that Plaintiff owns a surface water treatment plant in Savannah, Georgia, and that its surface water source is the Abercorn Creek. *Id*. The Abercorn Creek is a channel in the lower Savannah River system connected with the Savannah River. *Id*. ¶ 194.

8.      Plaintiff alleges that it brought this action to recover costs and obtain other relief relating to alleged contamination of its drinking water supply with PFAS. *See id*. ¶¶ 13-14. Plaintiff asserts that PFAS has been released into the Abercorn Creek and the Savannah River Basin; that Plaintiff must remove such PFAS from its drinking water supply; and that it must upgrade its water treatment plant to address PFAS. *See id.* ¶¶ 194-204. Plaintiff seeks compensatory and punitive damages, specifically including costs of upgrading its water treatment facility and other expenses for PFAS removal. *See id.*, ¶¶ 30-31.

9.      Plaintiff asserts that the PFAS for which it seeks to recover include perfluorooctanoic acid ("PFOA") and perfluorooctane sulfonic acid ("PFOS"), as well as chemicals that degrade to PFOA and PFOS and chemical precursors of PFOA and PFOS. *See id*. ¶ 1 n.1. PFOA and PFOS are PFAS chemicals that have been used in manufacturing AFFF products, including MilSpec AFFF.

10.     Plaintiff asserts claims against both "PFAS Manufacturer Defendants" (including 3M and certain other Defendants that supplied PFAS and/or PFAS-containing products) and "PFAS User Defendants" (including the owners and operators of local manufacturing facilities that used and discharged PFAS and/or PFAS-containing products). *See id*. ¶¶ 9-10, 33-112. Plaintiff generically alleges that Defendants "have generated PFAS-laded wastewater" that purportedly have polluted Plaintiff's water source. *Id*. ¶ 11. The "PFAS Users" allegedly discharge

5

PFAS to the Savannah River and/or its tributaries either directly or *via* discharges of industrial wastewater to treatment plants or landfills. *See id.* ¶¶ 184-192. The Complaint identifies specific wastewater treatment facilities as sources of PFAS in the Savannah River basin and Abercorn Creek, including the Horse Creek Wastewater Treatment Plant ("HCWWTP"), the Augusta Wastewater Treatment Plant ("Augusta WWTP"), and the Generostee Creek Wastewater Treatment Plant ("Generostee Creek WWTP"). *See, e.g.*, *id.* ¶¶ 187-192.

11.     Plaintiff alleges that it disclaims any damages from AFFF. *See id.* ¶¶ 1, 20, 22.

12.     Plaintiff asserts damages claims for negligence (*id.* ¶¶ 205-213), public nuisance (*id.* ¶¶ 214-220), private nuisance (*id.* ¶¶ 221-230); abatement of nuisance (*id.* ¶¶ 231-234); trespass (*id.* ¶¶ 235-244); violation of the Georgia Water Quality Control Act, O.C.G.A. § 12-5-51 (*id.* ¶¶ 245-252); failure to warn (*id.* ¶¶ 253-258); punitive damages (*id.* ¶¶ 259-267); and attorneys' fees and expenses of litigation (*id.* ¶¶ 268-269).

## THE PROCEDURAL REQUIREMENTS FOR REMOVAL ARE MET

13.     Venue for the removal of this action is proper in this Court pursuant to 28 U.S.C. §§ 90(c)(3) and 1442(a) because the Superior Court of Chatham County, Georgia, is located within the Southern District of Georgia, Savannah Division.

14.     3M is not required to notify or obtain the consent of any other Defendant in this action in order to remove Plaintiff's action as a whole under § 1442(a)(1). *See Durham v. Lockheed Martin Corp.*, 445 F.3d 1247, 1253 (9th Cir. 2006); *Fed. Home Loan Mortg. Corp. v. Crittenden*, 2012 WL 3023264, at *2 (M.D. Ala. June 14, 2012).

15.     Pursuant to 28 U.S.C. § 1446(a), 3M has attached as Exhibit A true and accurate copies of the Summons and Complaint, and 3M has collectively attached as Exhibit B true and

accurate copies of all other documents on file in this case in the Superior Court of Chatham County, Georgia.

16.     3M was served with the Complaint and Summons on February 12, 2025. This Notice of Removal is timely filed in accordance with 28 U.S.C. § 1446(b).

17.     Pursuant to 28 U.S.C. § 1446(d), 3M is serving a copy of this Notice of Removal upon all other parties to this case and is filing a copy with the Clerk of the Superior Court of Chatham County, Georgia.

18.     By filing a Notice of Removal in this matter, 3M does not waive the rights of any Defendant to object to service of process, the sufficiency of process, jurisdiction over the person, or venue; and 3M specifically reserves the rights of all Defendants to assert any defenses and/or objections to which they may be entitled.

19.     3M reserves the right to amend or supplement this Notice of Removal.

20.     If any question arises as to the propriety of the removal of this action, 3M requests the opportunity to present a brief and oral argument in support of removal.

## REMOVAL IS PROPER UNDER THE FEDERAL OFFICER REMOVAL STATUTE, 28 U.S.C. § 1442(a)(1)

21.     Removal here is proper under the federal officer removal statute, 28 U.S.C. § 1442(a)(1), which provides for removal of an action relating to a defendant's acts undertaken at the direction of a federal officer. Removal is appropriate under this provision where the removing defendant establishes that: (a) it is a "person" within the meaning of the statute; (b) it acted under federal authority; (c) its actions taken pursuant to a federal officer's direction have a causal nexus with plaintiff's claims or injuries or are otherwise related to the lawsuit; and (d) it can assert a "colorable" federal defense. *See Mesa v. California*, 489 U.S. 121, 124-25, 129-31, 133-35 (1989); *see also Caver v. Cent. Ala. Elec. Coop.*, 845 F.3d 1135, 1142 (11th Cir. 2017); *Sawyer v. Foster*

*Wheeler LLC*, 860 F.3d 249, 254 (4th Cir. 2017); *Cuomo v. Crane Co.*, 771 F.3d 113, 115 (2d Cir. 2014); *Isaacson*, 517 F.3d at 135.

22.     Removal rights under the federal officer removal statute are much broader than under the general removal statute, 28 U.S.C. § 1441. Suits against defendants acting on behalf of federal officers "may be removed despite the nonfederal cast of the complaint; the federal-question element is met if the defense depends on federal law." *Jefferson Cnty. v. Acker*, 527 U.S. 423, 431 (1999). This is because § 1442(a)(1) protects "the government's need to provide a federal forum for its officers and those who are 'acting under' a federal office." *Albrecht v. A.O. Smith Water Prods.*, No. 11 Civ. 5990(BSJ), 2011 WL 5109532, at *3 (S.D.N.Y. Oct. 21, 2011). This important federal policy "should not be frustrated by a narrow, grudging interpretation of [§] 1442(a)(1)." *Willingham v. Morgan*, 395 U.S. 402, 407 (1969). To the contrary, § 1442 as a whole must be "liberally construed" in favor of removal. *Watson v. Philip Morris Co., Inc.*, 51 U.S. 142, 147 (2007).

23.     All requirements for removal under § 1442(a)(1) are satisfied when, as here, the notice of removal alleges that the plaintiff's injuries are, at least in part, caused by or related to MilSpec AFFF, regardless of whether the plaintiff has purported to disclaim MilSpec AFFF-related injuries. *See, e.g.*, *See Maryland*, 2025 WL 727831, at *5-8 (rejecting plaintiffs' argument that their purported disclaimers precluded removal of PFAS lawsuit based on the theory that the alleged PFAS had derived in part from use of MilSpec AFFF); *Nessel*, 2021 WL 744683, at *3 (denying motion to remand in PFAS case because, notwithstanding plaintiffs' assertion "that they do not seek resolution of any claims related to MilSpec AFFF, . . . Plaintiffs cannot decide what defense Defendants might present"). Federal courts have found that removal under § 1442 is proper when the complaint seeks damages for alleged PFAS-related injuries from MilSpec AFFF. *See,*

*e.g.*, *In re AFFF*, 2019 WL 2807266, at *2-3 (D.S.C. May 24, 2019); Order, *In re AFFF Prods. Liab. Litig.*, MDL No. 2:18-mn-2873-RMG, ECF No. 320 (D.S.C. Sept. 27, 2019); *Ayo v. 3M Co.*, No. 18-CV-0373(JS)(AYS), 2018 WL 4781145 (E.D.N.Y. Sept. 30, 2018).

24. Here, the alleged PFAS from non-AFFF sources plausibly has commingled in Plaintiff's water supply with PFAS from MilSpec AFFF, and as a result, Plaintiff's claims for damages and other relief related to PFAS in its water supply relate to a single injury attributable at least in part to MilSpec AFFF. To the extent that alleged PFAS deriving from non-AFFF sources cannot actually be separated out from PFAS deriving from the MilSpec AFFF sources, Plaintiff necessarily is seeking to impose liability on 3M for alleged contamination attributable in part to MilSpec AFFF, despite its alleged disclaimer. Moreover, 3M is entitled to a federal forum to litigate any apportionment of Plaintiff's damages between PFAS from non-AFFF sources and PFAS from AFFF sources, as Courts of Appeals have recently held in other cases for alleged PFAS contamination in which the plaintiffs similarly purported to disclaim injury from AFFF. *See Maryland*, 2025 WL 727831, at *7 (holding that where "a factfinder must . . . decide the important causation and allocation questions," those questions "belong in federal court" ); *People ex rel. Raoul v. 3M Co.*, 111 F.4th 846, 849 (7th Cir. 2024) (holding that "a federal court should be the one to resolve" difficult questions of apportionment of PFAS-related injuries between non-AFFF sources and AFFF sources subject to a federal defense, and ordering remand *only* because the plaintiff conceded that, pursuant to its alleged disclaimer, it would not seek recovery for "mixed PFAS contamination" so its "recovery is barred" "[i]f even a morsel of contamination" is from AFFF). This case has been properly removed to this Court based on federal officer jurisdiction.

A.    **MilSpec AFFF**

25.    In the late 1960s/early 1970s, the U.S. military began using MilSpec AFFF on military bases, airfields, and Navy ships—settings where fuel fires are inevitable and potentially devastating—to train its personnel, put out fires, save lives, and protect property. Indeed, the U.S. Naval Research Laboratory developed AFFF (with some assistance from industry participants), and its researchers were granted the first AFFF patent in 1966.[1] Decades later, the Naval Research Laboratory described the development of AFFF as "one of the most far-reaching benefits to worldwide aviation safety."[2]

26.    The design, manufacture, and sale of MilSpec AFFF is governed by rigorous military specifications created and administered by Naval Sea Systems Command, part of the DoD. The applicable specification, Mil-F-24385, was first promulgated in 1969, and has been revised a number of times since then.[3] All MilSpec AFFF products must be "qualified for listing on the applicable Qualified Products List" prior to military procurement.[4] Prior to such listing, "a manufacturer's . . . products are examined, tested, and approved to be in conformance with specification requirements."[5] The MilSpec designates Naval Sea Systems Command as the agency responsible for applying these criteria and determining whether AFFF products satisfy the MilSpec's requirements. After a product is added to the Qualified Products List, "[c]riteria for

---

[1] U.S. Patent No. 3,258,423 (filed Sept. 4, 1963; published June 28, 1966).

[2] U.S. Navy, NRL/MR/1001-06-8951, The U.S. Naval Research Laboratory (1923–2005): Fulfilling the Roosevelts' Vision for American Naval Power 37 (2006) ("Fulfilling the Roosevelts' Vision"), https://permanent.fdlp.gov/gpo125428/roosevelts.pdf.

[3] The 1969 MilSpec and all its revisions and amendments through the April 2020 amendment (MIL-PRF-24385F(4)) are available at https://tinyurl.com/yxwotjpg.

[4] MIL-PRF-24385F(4) § 3.1 (2020).

[5] DoD, SD-6, Provisions Governing Qualification 1 (Feb. 2014), https://tinyurl.com/y5asm5bw.

retention of qualification are applied on a periodic basis to ensure continued integrity of the qualification status."[6] Naval Sea Systems Command "reserves the right to perform any of the [quality assurance] inspections set forth in the specification where such inspections are deemed necessary to ensure supplies and services conform to prescribed requirements."[7]

27.     From its inception until recently, the MilSpec included the express requirement that MilSpec AFFF contain "fluorocarbon surfactants"—the class of PFAS chemicals that includes PFOA and PFOS.[8] Even today, the AFFF MilSpec expressly contemplates the presence of PFOA and PFOS in AFFF formulations (subject to limits imposed in 2017).[9] Indeed, the AFFF MilSpec recognizes that it is not yet technically feasible for manufacturers to completely eliminate PFOA and PFOS from AFFF "while still meeting all other military specification requirements."[10]

28.     3M manufactured and sold PFAS-containing MilSpec AFFF to the U.S. military for over three decades pursuant to contracts with the United States. One or more of 3M's AFFF products were on the Navy's Qualified Products List for MilSpec AFFF from 1970 until 2010 (even though 3M had phased out production of AFFF beginning in 2000).[11] Over time, the U.S. military used MilSpec AFFF produced by 3M throughout the United States, including in Georgia.

---

[6] DoD, SD-6, *supra* n.5, at 1.

[7] *See, e.g.*, MIL-PRF-24385F(4) § 4.1 (2020).

[8] *See* Mil-F-24385 § 3.2 (1969); MIL-PRF-24385F(2) § 3.2 (2017). In May 2019, the MilSpec was revised to drop the explicit requirement that the surfactants in the product be "fluorocarbon." *See* MIL-PRF-24385F(3) § 3.2 (2019). But under current technology, the only AFFF products capable of meeting the MilSpec's stringent performance requirements—and the only ones listed on the military's Qualified Product List—are those containing fluorocarbon surfactants. Thus, as a practical matter, the MilSpec still requires fluorocarbon surfactants.

[9] *See* MIL-PRF-24385F(4) § 6.6 & Tables 1, 3 (2020).

[10] *See* MIL-PRF-24385F(4) § 6.6.

[11] *See* MIL-F-24385 QPL/QPD History for Type 3 AFFF (Oct. 24, 2014) & MIL-F-24385 QPL/QPD History for Type 6 AFFF (Oct. 24, 2014) (available at *In re AFFF Prods. Liab. Litig.*, No. 2:18-mn-02873, ECF No. 1969-24 (D.S.C.)).

29.    3M also historically manufactured and sold PFAS-containing MilSpec AFFF to non-military users, including in Georgia. One notable example relates to so-called "Part 139" airports, *i.e.*, certain large civilian airports. *See* 14 C.F.R. § 139.1 (2019). Part 139 airports historically have used MilSpec AFFF, including 3M's MilSpec AFFF products. In fact, by 2006, the U.S. government was requiring Part 139 airports to use AFFF meeting MilSpec standards.[12]

30.    The PFAS chemicals that allegedly are contaminating Plaintiff's drinking water supply plausibly have derived at least in part from the use, storage, and/or disposal of MilSpec AFFF at military facilities and elsewhere. Accordingly, Plaintiff's claims to recover for the alleged PFAS contamination of its water supply are related to or arise in part from MilSpec AFFF. Specifically, given the allegations in Plaintiff's Complaint, PFAS from the use, storage, and/or disposal of MilSpec AFFF at Fort Gordon (now Fort Eisenhower) and at the Savannah International Airport plausibly contributed to PFAS in Abercorn Creek where Plaintiff draws its drinking water supply.

31.    Fort Gordon is located in Augusta, Georgia, and PFAS detections in the groundwater at former fire training areas and fire stations there (as documented in a recent PFAS investigation) indicate that the U.S. military historically used, stored, and disposed of AFFF at the site. *See* Arcadis U.S. Inc., *Final Preliminary Assessment and Site Inspection of Per- and Polyfluoroalkyl Substances, Fort Gordon, Georgia* (Nov. 2021), *available at* https://aec.army.mil/Portals/115/PFAS/Gordon_PASI_RED.pdf. Both groundwater and surface water at Fort Gordon flow off-site in the direction of the Savannah River, providing potential pathways for the migration of PFAS from AFFF to the Savannah River. PFAS from MilSpec AFFF use at Fort Gordon is at

---

[12] *See* FAA Part 139 CertAlert 06-02, Aqueous Film Forming Foam (AFFF) meeting MIL-F-24385 (Feb. 8, 2006) (available at *In re AFFF Prods. Liab. Litig.*, No. 2:18-mn-02873, ECF No. 1971-14 (D.S.C.)).

least as plausible a source of PFAS in Plaintiff's water supply as PFAS releases from the HCWWTP, Augusta WWTP, and Generostee Creek WWTP, which Plaintiff's Complaint identifies as the sources of the alleged PFAS contamination. *See* Complaint ¶¶ 187-192. Fort Gordon is located approximately the same distance away from Plaintiff's water intakes on the Abercorn Creek as the HCWWTP and Augusta WWTP, each of which is also located in or near Augusta, Georgia, on the Savannah River. Fort Gordon is located much closer to Plaintiff's water intakes than the Generostee Creek WWTP: the Complaint identifies the Generostee Creek WWTP in Anderson, South Carolina, as a source of PFAS in Plaintiff's water supply even though it is located 100 miles further away from Plaintiff's water intakes than Fort Gordon. *See id.* ¶¶ 189, 192. Thus, PFAS from MilSpec AFFF use at Fort Gordon just as plausibly has contributed to PFAS in Plaintiff's water supply as PFAS from the wastewater treatment plants identified by Plaintiff's own Complaint as sources of the alleged contamination.

32.    For those same reasons, MilSpec AFFF use at the Augusta Regional Airport just as plausibly contributed to PFAS in Plaintiff's water supply as the wastewater treatment plants identified in the Complaint. The Augusta Regional Airport is a Part 139 airport located in Augusta, Georgia.[13] The airport is a known site where AFFF was used for firefighting and fire training.[14] 3M's sales records show that 3M formerly supplied the airport with MilSpec AFFF. Use of MilSpec AFFF at the airport plausibly contributed to PFAS levels in groundwater and surface water in and around the airport that would have impacted the Savannah River and ultimately Plaintiffs' water intakes on the Abercorn Creek.

---

[13] *See* Part 139 Airport Certification Status List (Excel file), *available at* https://www.faa.gov/airports/airport_safety/part139_cert/part_139_airport_certification_status_list.

[14] *See, e.g.*, *Augusta Regional Airport Fire Department statements; Maps or Charts of Accident Area, available at* https://data.ntsb.gov/Docket?ProjectID=81135

33.     The Savannah International Airport in Savannah, Georgia, is also a known site where AFFF has been used, stored, and discharged including by the U.S. military at the Savannah Air National Guard Base and former Travis Field. *See, e.g.*, AECOM, *Final Site Inspection Report, Air National Guard Phase II Regional Site Inspections for Per- and Polyfluoroalkyl Substances, Savannah Air National Guard Base* (Dec. 2018), *available at* https://ar.cce.af.mil/Search (AR# 590063) ("AECOM Report"). Any PFAS releases from MilSpec AFFF use at the Savannah International Airport plausibly migrated to Plaintiff's water supply. Although the Savannah International Airport is downriver from the Abercorn Creek along the Savannah River, the Savanah River there is influenced by ocean tides. At high tide, water from the Savannah River travels in the opposite direction—upriver into Abercorn Creek. Indeed, Plaintiff's own Complaint alleges that "water flow[s] between [Abercorn Creek] and the Savannah River in both directions depending on the tides," among other factors. Complaint ¶ 194. Especially given that allegation, it is plausible that, depending on the tides, PFAS releases from MilSpec AFFF use at the Savannah International Airport impacted Plaintiff's surface water intakes on the Abercorn Creek.

34.     Moreover, in addition to Plaintiff's surface water intakes upriver, Plaintiff maintains backup groundwater wells, and some of those backup wells are located at the Savannah International Airport near where AFFF has been used. *See* AECOM Report at ES-4. The immediate proximity of those wells to known AFFF releases further indicates that PFAS from AFFF plausibly has impacted Plaintiff's water supply system and/or has contributed to the costs that Plaintiffs seek to recover for investigating and removing PFAS impacting its water supply.

35.     MilSpec AFFF sources of PFAS in Plaintiff's water supply are not necessarily limited to those military facilities. MilSpec AFFF use at other nearby military facilities and/or other sites also potentially contributed to PFAS in Plaintiff's water supply.

36.    Once PFAS from AFFF has migrated from military bases and/or other AFFF sites to surrounding groundwater and surface water, the PFAS would commingle with and become indistinguishable from PFAS from any non-AFFF sources. Tellingly, Plaintiff's own Complaint alleges that PFAS "migrate through surface water and groundwater" and "travel long distances while causing extensive contamination." Complaint ¶ 114. PFAS from MilSpec AFFF plausibly has migrated and commingled with PFAS from non-AFFF sources in Plaintiff's water supply so that Plaintiff's effort to recover for *any* PFAS levels in its water supply provides a basis for 3M to assert its federal government contractor defense.

37.    Because the alleged PFAS contamination at issue in this action is, at least in part, plausibly attributable and/or related to MilSpec AFFF use at military facilities and elsewhere that has inseparably commingled in the water supply with PFAS from non-AFFF sources, 3M is entitled to remove this case as a whole pursuant to federal officer jurisdiction. That is because Plaintiff's claims for alleged PFAS necessarily relate to PFAS deriving at least in part from MilSpec AFFF sources, *i.e.*, "[i]t is entirely possible that Plaintiff['s] injuries occurred from actions taken while Defendants were acting under color of federal office: namely, MilSpec AFFF." *Nessel*, 2021 WL 744683, at *3. Although the Complaint purports to allege that Plaintiff is not seeking any relief for PFAS contamination from AFFF (*see* Complaint ¶¶ 20-22), Plaintiff's claims nonetheless relate to alleged PFAS contamination that is, at least in part, plausibly caused by or related to MilSpec AFFF (and not just non-AFFF PFAS sources). Plaintiff's disclaimer does not preclude removal of this case. *See Maryland*, 2025 WL 727831, at *5, 8 ("reject[ing] the notion that the States' purported disclaimers of 3M's federal conduct were dispositive" and "hold[ing] that 3M's Military AFFF production is inextricably related to the States' general allegations of PFAS contamination, notwithstanding their attempts to draw a line between 3M's federal and non-

federal work"); *Puerto Rico v. Express Scripts, Inc.*, 119 F.4th 174, 180 (1st Cir. 2024) (holding that defendant properly removed case under the federal officer removal statute, notwithstanding the plaintiff's alleged disclaimer of relief related to federal conduct, because "[t]o credit the disclaimer would permit [plaintiff] to recover based on what, when considered through [defendant's] theory of removal, were acts under a federal officer," and plaintiff's "attempts at artful pleading cannot serve as an end run around the federal officer removal statute"). Federal officer removal is proper despite the alleged disclaimer because the claimed injury from PFAS is plausibly due in part to PFAS from MilSpec AFFF—and at a minimum, 3M is entitled to litigate any apportionment of Plaintiff's injury between PFAS from MilSpec AFFF sources and PFAS from other sources in federal court. *See Maryland*, 2025 WL 727831, at *6 (holding that where "a factfinder must . . . decide the important causation and allocation questions," those questions "belong in federal court"); *Raoul*, 111 F.4th at 849 ("If the contamination came from AFFF, then the government contractor defense could apply . . . even though the State's complaint expressly excluded 3M from liability for PFAS contamination sources from AFFF" because "a factfinder would need to apportion the contamination" between AFFF and non-AFFF PFAS sources); *Nessel*, 2021 WL 744683, at *3 (denying State of Michigan's motion to remand and concluding that federal officer removal was proper notwithstanding the complaint's allegation that Michigan was not seeking relief for MilSpec AFFF; "Plaintiffs' artful pleading does not obviate the facts on the ground.").

**B.    All the Requirements of 28 U.S.C. § 1442(a)(1) Are Satisfied**

*1.    The "Person" Requirement Is Satisfied*

38.    The first requirement for removal under the federal officer removal statute is satisfied here because 3M (a corporation) meets the definition of "person" under the statute. For

purposes of § 1442(a)(1), the term "person" includes corporations. *Papp v. Fore-Kast Sales Co.*, 842 F.3d 805, 812 (3d Cir. 2016) (quoting 1 U.S.C. § 1); *accord Isaacson*, 517 F.3d at 135-36.

### 2.    The "Acting Under" Requirement Is Satisfied

39.    The second requirement ("acting under" a federal officer) is satisfied when an entity assists or helps carry out the duties or tasks of a federal officer. *Watson*, 551 U.S. at 152; *Papp*, 842 F.3d at 812. The phrase "acting under" is to be "liberally construed in favor of the entity seeking removal." *Sawyer*, 860 F.3d at 255 (internal quotation marks omitted). Federal courts "have explicitly rejected the notion that a defendant could only be 'acting under' a federal officer if the complained-of conduct was done at the specific behest of the federal officer or agency." *Papp*, 842 F.3d at 813. Rather, "courts have unhesitatingly treated the 'acting under' requirement as satisfied where a contractor seeks to remove a case involving injuries arising from equipment that it *manufactured for the government*." *Sawyer*, 860 F.3d at 255.

40.    The requirement of "acting under" a federal officer is met here because the alleged PFAS contamination at issue in this action stems in part from MilSpec AFFF, a vital product provided by 3M that otherwise "the Government would have had to produce itself." *Isaacson*, 517 F.3d at 137. MilSpec AFFF is a mission-critical military and aviation safety product that, without the support of private contractors, the government would have to produce for itself. *See Ayo*, 2018 WL 4781145, at *9 (describing MilSpec AFFF as a "mission-critical" and "life-saving product" used by all branches of the U.S. armed forces and NATO members (internal quotation marks omitted)). The Naval Research Laboratory states that, "[a]lthough [it] was responsible for the original concepts and formulations, it was necessary to elicit the aid of the chemical industry to synthesize the fluorinated intermediates and agents to achieve improvements in formulations."[15]

---

[15] Fulfilling the Roosevelts' Vision at 37.

Accordingly, the military has long depended upon outside contractors like 3M to develop and supply AFFF.

41.    In designing, manufacturing, and supplying the MilSpec AFFF at issue, 3M acted under the direction and control of federal officers. Specifically, 3M acted in accordance with detailed specifications, promulgated by Naval Sea Systems Command, that govern AFFF formulation, performance, testing, storage, inspection, packaging, and labeling. Further, MilSpec AFFF products were subject to various tests by the U.S. Navy before and after being approved for use by the military and for inclusion on the Qualified Products List maintained by the DoD.[16]

42.    For these reasons, 3M has satisfied the "acting under" requirement. *See In re AFFF*, 2019 WL 2807266, at *2 (finding that "acting under" requirement was satisfied because defendant demonstrated that it manufactured MilSpec AFFF under guidance of U.S. military); *Nessel*, 2021 WL 744683, at *3 (holding that AFFF manufacturers were "acting under" a federal officer in connection with manufacture and sale of MilSpec AFFF); *Ayo*, 2018 WL 4781145, at *8-9 (same).

### 3.    The "Under Color Of Federal Office" Requirement Is Satisfied

43.    The third requirement, that the defendant's actions were taken "under color of federal office," requires a "nexus" between plaintiff's claims and the defendant's acts undertaken at the direction of a federal officer. As with the "acting under" requirement, "[t]he hurdle erected by this requirement is quite low." *Isaacson*, 517 F.3d at 137. To meet this requirement, "there need be only *a connection or association* between the act in question and the federal office." *Sawyer*, 860 F.3d at 258 (internal quotation marks omitted) (explaining that 28 U.S.C. § 1442 permits removal of actions "for *or relating to* any act under color of [federal] office"); *Papp*, 842 F.3d at

---

[16] *See* DoD, SD-6, *supra* n.5, at 1.

813; *Isaacson*, 517 F.3d at 137-38 (explaining that it is sufficient if the act that allegedly caused the plaintiff's injuries occurred while the defendant was performing its official duties).[17]

44.    Here, Plaintiff's claims against 3M for alleged PFAS contamination of its water and wastewater are for or relate to (at least in part) 3M's design, manufacture, and sale of MilSpec AFFF. MilSpec AFFF was designed and manufactured according to DoD military specifications; has been used, stored, and/or released at military facilities and elsewhere in the vicinity of Plaintiff's water supply; and has plausibly impacted PFAS levels of Plaintiff's water supply. As a result, Plaintiff's claims against 3M relate to its acts taken under color of federal office. *See In re AFFF*, 2019 WL 2807266, at *3 (nexus element satisfied where "[Plaintiff]'s claims arise out of use of AFFF products . . . for which the U.S. military imposes MilSpec standards."); *Ayo*, 2018 WL 4781145, at *9 ("[T]here is evidence of a 'casual connection' between the use of PFCs in AFFF and the design and manufacture of AFFF for the government.").

45.    Courts "credit Defendants' theory of the case" when determining whether the requisite nexus exists. *Isaacson*, 517 F.3d at 137; *see Maryland*, 2025 WL 727831, at *4-5; *Express Scripts, Inc.*, 119 F.4th at 192; *Nessel*, 2021 WL 744683, at *3 (noting that "Plaintiffs cannot decide what defense Defendants might present"). As averred in this Notice of Removal, Plaintiff's alleged injuries plausibly arise at least in part from MilSpec AFFF. Plaintiff's claims thus sufficiently relate to 3M's actions under color of federal office. "[I]t is enough for . . . removal that at least some of the pollution arose from the federal acts." *Baker v. Atl. Richfield Co.*, 962 F.3d 937, 943 (7th Cir. 2020)).

---

[17] The "acting under" and "under color of" prongs overlap. Both "are satisfied if the actions subject to suit resulted directly from government specifications or direction." *Albrecht*, 2011 WL 5109532, at *5.

### 4.    The *"Colorable Federal Defense" Requirement Is Satisfied*

46.    The fourth requirement ("colorable federal defense") is satisfied by 3M's assertion of the government contractor defense.

47.    At the removal stage, a defendant need only show that its government contractor defense is colorable; that is, "that the defense was 'legitimate and [could] reasonably be asserted, given the facts presented and the current law.'" *Papp*, 842 F.3d at 815 (alteration in original) (citation omitted). "A defendant 'need not win his case before he can have it removed.'" *Id.* (quoting *Willingham*, 395 U.S. at 407); *see also Isaacson*, 517 F.3d at 139 ("To be 'colorable,' the defense need not be 'clearly sustainable,' as the purpose of the statute is to secure that the validity of the defense will be tried in federal court." (citation omitted)). At the removal stage, the inquiry "is purely jurisdictional, and neither the parties nor the district courts should be required to engage in fact-intensive motion practice, pre-discovery, to determine the threshold jurisdictional issue." *Cuomo*, 771 F.3d at 116; *see also Kraus v. Alcatel-Lucent*, No. 18-2119, 2018 WL 3585088, at *2 (E.D. Pa. July 25, 2018) ("A court does not 'determine credibility, weigh the quantum of evidence or discredit the source of the defense' at this stage. Instead, [the court] only determine[s] whether there are sufficient facts alleged to raise a colorable defense." (internal citation omitted)). Moreover, "this inquiry is undertaken whilst viewing the facts in the light most favorable to Defendants." *Hagen v. Benjamin Foster Co.*, 739 F. Supp. 2d 770, 783–84 (E.D. Pa. 2010). "Precisely in those cases where a plaintiff challenges the factual sufficiency of the defendant's defense, the defendant should 'have the opportunity to present [his] version of the facts to a federal, not a state, court.'" *Cuomo*, 771 F.3d at 116 (quoting *Willingham*, 395 U.S. at 409).

48.    Under the government contractor defense, the defendant is not liable for the design or manufacture of equipment or supplies (or for warnings relating to them) "when (1) the United States approved reasonably precise specifications; (2) the equipment conformed to those

specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States." *Boyle*, 487 U.S. at 512.

49.    The requirement of "reasonably precise specifications" can be met by evidence showing either (a) that the government's participation in the design of the product "amount[ed] to more than a rubber stamping," or (b) that the government continued to purchase or use a product after the government became aware that the product contained the alleged defect. *Ramey v. Martin-Baker Aircraft Co. Ltd.*, 874 F.2d 946, 950 (4th Cir. 1989). Naval Sea Systems Command participated in the design of MilSpec AFFF, and its role was not a mere "rubber stamping." It created (and has updated) detailed specifications governing the product's formulation, performance, testing, storage, inspection, packaging, and labeling.[18] Those specifications are "reasonably precise," including in requiring the use of PFAS.[19] In addition, in the past and continuing to the present, the DoD has purchased and used MilSpec AFFF with awareness of the product's PFAS content and of the alleged risks associated with PFAS in the product. *See In re AFFF*, 2019 WL 2807266, at *3 (noting that a colorable defense was alleged where AFFF MilSpec "included specifications for the chemical class that includes PFOS/PFOA"); *Ayo*, 2018 WL 4781145, at *12 ("That the DoD knows of the alleged risks of PFC-based AFFF products but continues to purchase them supports the position that the government approved reasonably precise specifications for the claimed defective design.").

---

[18] *See* Mil-F-24385 (1969) and subsequent revisions and amendments, cited in note 3, *supra*.

[19] As noted earlier, until 2019 the specification expressly required that MilSpec AFFF contain "fluorocarbon surfactants," all of which are members of the PFAS family. Even since that express requirement was removed from the specification, the use of PFAS has been implicitly mandated because PFAS-containing surfactants are the only kind that allow AFFF to meet the performance requirements of the specification.

50.     With respect to the second requirement, 3M's products have appeared on the DoD Qualified Products List,[20] which could have happened only if Naval Sea Systems Command had first determined that they conformed to the MilSpec. *See In re AFFF*, 2019 WL 2807266, at *3 (finding that defendant demonstrated a colorable defense "where it contends that its AFFF products were manufactured according to the U.S. military's MilSpec specifications"); *Ayo*, 2018 WL 4781145, at *13 ("There is also colorable evidence . . . that Manufacturing Defendants' AFFF products conformed to the government's reasonably precise specifications.").

51.     Regarding the third requirement, the U.S. government was sufficiently informed regarding alleged product-related "dangers," *Boyle*, 487 U.S. at 512, to exercise its discretionary authority in specifying and procuring MilSpec AFFF. The military specifications have long included testing protocols and requirements for toxicity, chemical oxygen, and biological demand. Indeed, it is clear that the United States has long understood that AFFF contains PFAS and may contain or break down into PFOS and/or PFOA; that AFFF constituents can migrate through the soil and potentially reach groundwater; and that it has been reported that this may raise environmental or human health issues.[21] For example, as early as October 1980, a report supported by the U.S. Navy Civil Engineering Laboratory, U.S. Air Force Engineering Service Center, and the U.S. Army Medical Research and Development Command stated that AFFF contained fluorocarbons and that "[a]ll of the constituents resulting from firefighting exercises are considered to have adverse effects environmentally."[22] In June 1991, the Air Force stated that past Air Force

---

[20] *See* QPL/QPD Histories, *supra* n.11.

[21] *See, e.g.*, EPA, *Revised Draft Hazard Assessment of Perfluorooctanoic Acid and Its Salts* 1-6 (Nov. 4, 2002).

[22] *See* Edward S. K. Chian et al., *Membrane Treatment of Aqueous Film Forming Foam (AFFF) Wastes for Recovery of Its Active Ingredients* 1 (Oct. 1980), https://apps.dtic.mil/dtic/tr/fulltext/u2/a136612.pdf.

fire training activities resulted in "adverse environmental impact," including "soil contamination" and the "potential" for "groundwater contamination."[23] By no later than 2001, DoD was aware of data purportedly showing PFAS compounds in MilSpec AFFF to be "toxic" and "persistent."[24] In 2002, the United States Environmental Protection Agency issued a draft hazard assessment for PFOA, which reviewed in detail, among other data, human epidemiological studies and animal toxicology studies pertaining to alleged associations between PFOA and cancer.[25] More recently, in a November 2017 report to Congress, the DoD acknowledged the concerns raised by the EPA regarding PFOS and PFOA. Nonetheless, the DoD still described AFFF containing PFOS or PFOA as a "mission critical product [that] saves lives and protects assets by quickly extinguishing petroleum-based fires."[26] Indeed, Naval Sea Systems Command continues to require that MilSpec AFFF contain "surfactants,"[27] and recognizes that PFAS, including PFOS and PFOA, will be present (subject to recently imposed limits for PFOS and PFOA) in AFFF formulations.[28] *See In re AFFF*, 2019 WL 2807266, at *3 ("As to whether [defendant] adequately informed the U.S. military of dangers associated with its AFFF products of which the military was not already aware, [defendant] points to materials such as a November 2017 Department of Defense report to Congress, in which the agency acknowledged the [EPA]'s stated concerns with PFOS/PFOA in

---

[23] USAF, Engineering Technical Letter ETL 91-4: Site Selection Criteria for Fire Protection Training Areas 2 (June 14, 1991).

[24] EPA Presentation on Activities/Issues on Fluorosurfactants, March 16, 2001 (available at *In re AFFF Prods. Liab. Litig.*, No. 2:18-mn-02873, ECF No. 1971-2 (D.S.C.)).

[25] *See* EPA, Revised Draft Hazard Assessment, *supra* n.20.

[26] DoD, *Aqueous Film Forming Foam Report to Congress* 1-2 (Oct. 2017) (pub. Nov. 3, 2017), https://tinyurl.com/wshcww4.

[27] MIL-PRF-24385F(4) § 3.2 (2020).

[28] MIL-PRF-24385F(4) § 6.6 & Tables I, III; *see also* David Vergun, *DOD Officials Discuss Fire-Fighting Foam Replacement, Remediation Efforts* (Sept. 16, 2020), https://tinyurl.com/ty5ku8hp.

drinking water . . . ."); *Ayo*, 2018 WL 4781145, at *12 ("That the DoD knows of the alleged risks of PFC-based AFFF products but continues to purchase them supports the position that the government approved reasonably precise specifications for the claimed defective design.").

52.    At minimum, these facts constitute colorable evidence that Naval Sea Systems Command "made a discretionary determination" regarding the formulation of MilSpec AFFF after weighing the fire-suppression benefits against the alleged risks. *See In re "Agent Orange" Prod. Liab. Litig.*, 517 F.3d 76, 90 (2d Cir. 2008); *see also Albrecht*, 2011 WL 5109532, at *5 ("A defendant is not required to warn the government where 'the government knew as much or more than the defendant contractor about the hazards of the product.'" (citation omitted)). Where, as here, the government has exercised "discretionary authority over areas of significant federal interest such as military procurement," the government contractor defense applies. *In re "Agent Orange" Prod. Liab. Litig.*, 517 F.3d at 89-90; *see also Ayo*, 2018 WL 4781145, at *13.

53.    In the MDL, the court has found based on an extensive factual record that the government contractor defense asserted by 3M presents genuine issues of fact for trial. *See In re AFFF Prods. Liab. Litig.*, No. 2:18-mn-02873, 2022 WL 4291357, at *12, 15 (D.S.C. Sept. 16, 2022). A defense that presents triable issues is, by definition, better than merely "colorable."

54.    3M's use of PFAS in MilSpec AFFF was required by military specifications. By seeking to impose tort liability on 3M for alleged injuries to Plaintiff that were caused in whole or in part by 3M's compliance with military specifications, Plaintiff is attempting to use state tort law to attack design choices dictated by the military. The government contractor defense precludes such an attack. *See Boyle*, 487 U.S. at 509.

55.    Accordingly, 3M is entitled to remove this action to federal court pursuant to the federal officer removal statute, 28 U.S.C. § 1442(a)(1).

WHEREFORE, 3M hereby removes this action from the Superior Court of Chatham County, Georgia, to the United States District Court for the Southern District of Georgia, Savannah Division.

Respectfully submitted,

March 14, 2025

By: */s/ Charles G. Spalding, Jr.*
Charles G. Spalding, Jr.
Georgia Bar No. 411926
**KING & SPALDING, LLP**
1180 Peachtree Street, N.E.
Atlanta, GA  30309-3521
Telephone:  404-572-4600
Fax:  404-572-5100
cspalding@kslaw.com

*Counsel for Defendant 3M Company*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 14, 2025, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to counsel of record. I further certify that I caused a true and correct copy of the foregoing document to be served upon the following parties by First Class Mail and/or by Email, as indicated below:

**<u>By Mail and Email</u>:**

R. Bates Lovett
Office of the City Attorney
2 East Bay Street
City Hall, 3rd Floor GA
Savannah, GA 31401
blovett@savannahga.gov

Jeffrey R. Harris
Steven G. Lowry
Jed D. Manton
Madeline E. McNeeley
Cole F. Donahue
Harris Lowry Manton LLP
410 East Broughton Street
Savannah, Georgia 31401
jeff@hlmlawfirm.com
steve@hlmlawfirm.com
jed@hlmlawfirm.com
molly@hlmlawfirm.com
cdonahue@hlmlawfirm.com

Rebecca Franklin Harris
Franklin Law LLC
2919 River Dr.
Thunderbolt, GA 31404
rebecca@franklinlawllc.com

Jeff Friedman
Matt Conn
Madison Gitschier
Ethan Wright
Friedman, Dazzio & Zulanas, P.C.
3800 Corporate Woods Drive
Birmingham, AL 35242

1

jfriedman@friedman-lawyers.com
mconn@friedman-lawyers.com
mgitschier@friedman-lawyers.com
ewright@friedman-lawyers.com

**By Mail:**

ALADDIN MANUFACTURING CORPORATION
c/o CSC of Cobb County, Inc.
192 Anderson Street SE, Suite 125
Marietta, GA 30060

ALLNEX USA, INC.
c/o Corporation Service Company
2 Sun Court, Suite 400
Peachtree Corners, GA 30092

ARCHROMA U.S., INC
c/o C T Corporation System
289 S Culver St
Lawrenceville, GA 30046-4805

AUGUSTA LIQUIDATIONS LLC
c/o C T Corporation System
289 S Culver St
Lawrenceville, GA 30046-4805

CLARIANT CORPORATION
c/o Corporation Service Company
2 Sun Court, Suite 400
Peachtree Corners, GA 30092

CLEARWATER PAPER CORPORATION
c/o United Agent Group Inc.
2985 Gordy Parkway, 1st Floor
Marietta, GA 30066

CORTEVA, INC.
c/o C T Corporation System
289 S Culver St
Lawrenceville, GA 30046-4805

COVESTRO LLC
c/o Corporation Service Company
2 Sun Court, Suite 400

Peachtree Corners, GA 30092

COVESTRO COATING RESINS, INC.
c/o Corporation Service Company
2 Sun Court, Suite 400
Peachtree Corners, GA 30092

CYTEC INDUSTRIES INC.
c/o Corporation Services Company
2 Sun Court, Suite 400
Peachtree Corners, GA 30092

DAIKIN AMERICA, INC.
c/o The Corporation Trust Company
Corporation Trust Center
1209 Orange St
Wilmington, DE 19801

DUPONT DE NEMOURS, INC.
c/o The Corporation Trust Company
Corporation Trust Center
1209 Orange St
Wilmington, DE 19801

E.I. DU PONT DE NEMOURS AND COMPANY
974 Centre Road
P.O. Box 2909
Wilmington, DE 19805

EIDP, INC.
c/o C T Corporation System
289 S Culver St
Lawrenceville, GA 30046-4805

ENVALIOR ENGINEERING MATERIALS, INC.
c/o Corporation Service Company
2 Sun Court, Suite 400
Peachtree Corners, GA 30092

FIRST QUALITY TISSUE SE, LLC
c/o C T Corporation System
2 Office Park Ct Ste 103
Columbia, SC 29223

GRANITEVILLE SPECIALTY FABRICS, LLC

3

c/o Client RA Services, Inc.
3060 Peachtree Rd. NW, Suite 1550
Atlanta, GA 30305

GRAPHIC PACKAGING HOLDING COMPANY
c/o Corporation Service Company
2 Sun Court, Suite 400
Peachtree Corners, GA 30092

GRAPHIC PACKAGING INTERNATIONAL, LLC
c/o Corporation Service Company
2 Sun Court, Suite 400
Peachtree Corners, GA 30092

HALOCARBON LIFE SCIENCES, LLC
6525 The Corners Parkway, Suite 200
Peachtree Corners, GA 30092

HALOCARBON, LLC
6525 The Corners Parkway, Suite 200
Peachtree Corners, GA 30092

HPC HOLDINGS, INC.
6525 The Corners Parkway, Suite 200
Peachtree Corners, GA 30092

ICT INDUSTRIES, INC.
103 Walnut Grove Rd
Cartersville, GA 30120

INDUSTRIAL METAL FINISHING, INC.
620 12th St
Augusta, GA 30901

INNOVATIVE CHEMICAL TECHNOLOGIES, INC.
103 Walnut Grove Rd
Cartersville, GA 30120

INTERNATIONAL PAPER COMPANY
c/o C T Corporation System
289 S Culver St
Lawrenceville, GA 30046-4805

INV PERFORMANCE SURFACES, LLC
c/o United Agent Group Inc.

4

2985 Gordy Parkway, 1st Floor
Marietta, GA 30066

JPS COMPOSITE MATERIALS CORP.
971 N. Hairston Road Suite A9-145
Stone Mountain, GA 30083

KEMIRA WATER SOLUTIONS INC.
c/o Cogency Global
900 Old Roswell Lakes Parkway, Suite 310
Roswell, GA 30076

KIMBERLY-CLARK CORPORATION
c/o C T Corporation System
289 S Culver St
Lawrenceville, GA 30046-4805

MILLIKEN & COMPANY
c/o C T Corporation System
289 S Culver St
Lawrenceville, GA 30046-4805

MOHAWK CARPET, LLC
c/o CSC of Cobb County, Inc.
192 Anderson Street SE, Suite 125
Marietta, GA 30060

MOHAWK INDUSTRIES, INC.
c/o CSC of Cobb County, Inc.
192 Anderson Street SE, Suite 125
Marietta, GA 30060

MOUNT VERNON MILLS, TNC.
c/o John F. LeeNiedrach
111 Bridgepoint Plaza, Suite 300
Rome, GA 30161

OWENS CORNING
c/o Corporation Service Company
2 Sun Court, Suite 400
Peachtree Corners, GA 30092

OWENS CORNING COMPOSITE MATERIALS, LLC
c/o Corporation Service Company
2 Sun Court, Suite 400

5

Peachtree Corners, GA 30092

OWENS CORNING ROOFING AND ASPHALT, LLC
c/o Corporation Service Company
2 Sun Court, Suite 400
Peachtree Corners, GA 30092

OWENS CORNING SALES, LLC
c/o Corporation Service Company
2 Sun Court, Suite 400
Peachtree Corners, GA 30092

PACTIV LLC
c/o Corporation Service Company
2 Sun Court, Suite 400
Peachtree Corners, GA 30092

PRAYON INC.
c/o C T Corporation System
289 S Culver St
Lawrenceville, GA 30046-4805

QUALAWASH HOLDINGS, LLC
c/o Corporation Service Company
2 Sun Court, Suite 400
Peachtree Corners, GA 30092

SAGE AUTOMOTIVE INTERIORS, INC.
c/o Corporation Service Company
2 Sun Court, Suite 400
Peachtree Corners, GA 30092

SHAW INDUSTRIES GROUP, INC.
c/o Corporation Service Company
2 Sun Court, Suite 400
Peachtree Corners, GA 30092

SHAW INDUSTRIES, INC.
c/o Corporation Service Company
2 Sun Court, Suite 400
Peachtree Corners, GA 30092

SOLVAY SPECIALTY POLYMERS USA, L.L.C.
c/o Corporation Service Company
2 Sun Court, Suite 400

Peachtree Corners, GA 30092

STERLING  SPECIALTY CHEMICALS US LLC
c/o C T Corporation System
289 S Culver St
Lawrenceville, GA 30046-4805

THE CHEMOURS COMPANY
c/o C T Corporation System
289 S Culver St
Lawrenceville, GA 30046-4805

THE CHEMOURS COMPANY FC, LLC
c/o C T Corporation System
289 S Culver St
Lawrenceville, GA 30046-4805

TRANTECH RADIATOR PRODUCTS, INC.
c/o Corporation Service Co.
508 Meeting Street
West Columbia, South Carolina 29169

*Defendants*

/s/ Charles G. Spalding, Jr.
Charles G. Spalding, Jr.